Ivery Y. GARDNER, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–609.

District of Columbia Court of Appeals.

Argued June 17, 2003.

Decided May 4, 2006.

Mary Manning Petras for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time of oral argument, and Kenneth L. Wainstein, United States Attorney, Roy W. McLeese, III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, and KING and TERRY,* Senior Judges.

KING, Senior Judge:

On February 14th, 1995, Razell McCoy, Charles Johnson, and Tayron Fleming were shot and killed while seated in a burgundy Nissan Maxima parked near the intersection of Georgia Avenue and Buchanan Street, in the northwest quadrant of the District of Columbia. In November 1997, a jury convicted appellant Ivery Gardner of three counts of second-degree murder[1] as lesser included offenses of first-degree murder,[2] possession of a firearm during a crime of violence or dangerous offense,[3] and carrying a pistol without a license.[4] Gardner claims that the trial court committed several procedural errors warranting a reversal of his convictions. We affirm.

## I.

Within an hour of the shooting, police apprehended Gardner on a nearby street based on several eyewitness descriptions of the gunman's physical characteristics and clothing. Police found a box of ammunition in the pocket of the coat that Gardner was wearing. That ammunition matched both the bullets found in the murder weapon (recovered on another street

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. D.C.Code § 22–2103 (2001).

2. D.C.Code §§ 22–2401 and –3202.

3. D.C.Code § 22–3204(b).

4. D.C.Code § 22–3204(a).

several blocks away) and the bullets recovered from the bodies of the decedents.

At trial, several police officers testified as to the physical and ballistic evidence, and to the details of Gardner's apprehension and arrest. The government mainly elicited its theory of the case through the testimony of Charles Walker and Victor Drummings. Walker testified that he was close friends with the three decedents, and that they all knew Gardner from the neighborhood. Walker made a living as a drug dealer, and in early February 1995, he bought a white Cadillac DeVille with the proceeds of his sales. At the time, Walker owed Gardner $600 from a transaction in which Walker had obtained drugs from Gardner.

According to Walker, at about 6 p.m. on the evening of the murders, Gardner and a friend, Walter Deal, saw Walker in the Cadillac. Gardner hailed Walker to the side of the street, and Gardner requested the $600. When Walker replied that he did not have the money, Gardner ordered him out of the Cadillac at gunpoint, and drove off in the Cadillac after informing Walker that he would return the car once Walker had paid his debt. Walker then met with a friend, Michael Hunter, who drove Walker to a motel where Walker spent the night.[5] Walker intended to earn enough in drug sales the following day to recover his car from Gardner, but by the next morning his three friends had been murdered and Gardner was in police custody.

Victor Drummings testified that on the evening of the 14th at around 9 p.m., he and the three decedents McCoy, Johnson, and Fleming were driving in Fleming's Nissan when they stopped at a gas station where Drummings used the public tele-

phone. Gardner then pulled into the station driving Walker's Cadillac. Johnson asked Gardner where Walker was, and Gardner replied that he had dropped Walker off at Walker's girlfriend's house. As the group left the gas station, they agreed that it was unlikely that Walker would allow anyone else drive his new Cadillac, so they returned to the station and maneuvered the Nissan so as to block the Cadillac from exiting. Johnson went to speak with Gardner while Drummings used the pay phone again. Although Drummings could not hear what was said, it appeared to him that Johnson and Gardner were arguing. Shortly afterward, Gardner left the gas station lot in the Cadillac.

Within minutes, however, Gardner returned, parking the Cadillac so that the Nissan was trapped. Angered, Johnson went over to speak to Gardner, and again, it appeared to Drummings that the two were arguing. Eventually, Johnson and Gardner shook hands, and Johnson returned to the group, explaining that Gardner had Walker's Cadillac because Walker owed Gardner money. According to Drummings, Johnson also reported seeing a pistol in Gardner's waistband.

Thereafter, according to the testimony of eyewitnesses Joyce Hebron, Vonderleria Butler, Willie Kennedy, and Portia Brown, the three decedents had another encounter with Gardner at approximately 2:30 a.m. A man matching Gardner's description was seen near the intersection of Georgia Avenue and Buchanan Street. That man leaned into the driver's side window of a dark-colored car, and several gunshots were fired. The testimony further indicated that, while carrying an object that ap-

---

**5.** Hunter testified that he let Walker register under Hunter's name because Walker did not have his identification with him. The motel's records confirm that a man using the name Michael Hunter checked in that evening.

peared to be a gun, the man went around to the passenger's side of the car, opened the door, reached into the back of the car, fired several more shots, and then fled in a white Cadillac.[6]

Finally, Clinton Reid testified that he had been a fellow inmate of Gardner's at the D.C. Jail, and that the pair met while Gardner was awaiting trial. Reid testified that Gardner said that he "did it in self-defense."

Gardner testified on his own behalf, admitting that he was present during the shooting, but claimed that Walker was the actual gunman. According to Gardner, he and Walker had spent much of the night together, first at a high school basketball game, and later at a strip club called the Penthouse. After the club closed, the pair encountered the decedents on the street, and Walker unexpectedly killed the three men as a result of a debt which Johnson owed to Walker. Gardner testified that after the shooting, Walker got into the back seat of the Cadillac and ordered him to drive away. Gardner complied, and a few minutes later, the pair abandoned the vehicle and parted ways. Because the February night was cold, Gardner grabbed a coat that was in the back of the Cadillac; he denied, however, that the coat was his or that he knew it contained the box of ammunition.[7] On cross examination, Gardner conceded that his appearance that evening matched the eyewitness descriptions of the gunman.[8]

The jury deliberated for several days, ultimately returning the guilty verdicts. Gardner timely appealed, but we remanded the record on June 18, 2003, for further findings on the question of whether the transcript of Gardner's testimony, which the jury had requested, was actually received by the jury during their deliberations. Following supplemental findings of fact by the trial court and supplemental briefings by the parties in this court, which were completed on January 25, 2006, the case is again before us.

## II.

### A.

Gardner argues that the trial court abused its discretion in several respects in responding to the jury's requests during deliberations to provide transcripts of the testimony of two government witnesses and the defendant, Ivery Gardner.

■ Jury deliberations commenced on Tuesday, November 18. The following afternoon, the jury requested the transcript of the testimony of Portia Brown, one of the eyewitnesses to the shooting. Concerned about the possibility that the jury "may give Portia Brown's testimony undue weight" if it had her transcript, Gardner objected, suggesting that the court instead instruct the jurors that their recollections should control. The objection was overruled, and the transcript was duly prepared and given to the jury on Thursday, November 20.[9] Later that day, the jury

6. Soon thereafter, police found Walker's Cadillac on the same street where the murder weapon was recovered.

7. Gardner also testified that he had been driving Walker's Cadillac that day because Walker had just been incarcerated for driving without a license; he also denied that Walker owed him $600 and denied that he ever spoke to Reid about the murder charges that were pending against him.

8. The defense also called Walter Deal, who was with Gardner at the time they initially spotted Walker in his Cadillac. Deal confirmed that in the early evening of the 14th, the meeting between Walker and Gardner did in fact occur.

9. Over Gardner's objection, the trial court provided the jury with a transcript of Brown's in-court testimony and a copy of Brown's pretrial statement, a document which had

requested the transcripts of both Joyce Hebron (a government witness) and the defendant, Ivery Gardner. Counsel for Gardner noted a continuing objection to the production of any transcripts. The judge informed the jury that they would be receiving the transcripts as they became available. The next day, Friday, the jury received Hebron's transcript. The judge [10] informed the jury that it "expected fully that the copy of the transcript that was not provided to you today will be provided to you on Monday .... And as soon as it is presented to the Court, it will be produced to you." On Monday morning, the jury announced that it had reached a decision. The judge,[11] without objection from Gardner, then received the verdicts described above.[12]

When we first heard this case, it was unclear from the record whether the jury ever received the transcript of Gardner's testimony before delivering the verdict. Therefore, following oral argument, we remanded the record for supplemental findings on that point. Over the course of the following two and a half years, the remand judge heard testimony from eleven of the twelve deliberating jurors.[13] Based on the jurors' collective testimony on remand, the judge found, by a preponderance of the

evidence, that the jury delivered its verdict before receiving Gardner's transcript. Neither party challenges that finding by the trial court. The judge also concluded that "the jury decided that it could comfortably reach a unanimous verdict without viewing a transcript of Mr. Gardner's testimony." [14]

■ Gardner first claims that the trial court abused its discretion in providing the transcripts of the two government witnesses to the jury. We do not agree. The trial court has "broad discretion" in deciding whether to provide transcripts of testimony requested by the jury. *Fuller v. United States*, 873 A.2d 1108 (D.C.2005); *United States v. (Ralph) Wilson*, 333 U.S.App. D.C. 103, 119, 160 F.3d 732, 748 (1998). However, that discretion is limited by two inherent dangers: "the jury may accord 'undue emphasis' to the testimony," and it may apprehend the testimony out of context. *Id.*, quoting *United States v. Rodgers*, 109 F.3d 1138, 1142 (6th Cir. 1997).

The trial court's instructions to the jury adequately ameliorated the risk of "inherent danger." In that regard, we note that before the court gave the jury the tran-

been admitted into evidence during trial. During Brown's testimony, counsel for Gardner had used the pretrial statement to impeach Brown; however, on redirect, the government used a different portion of the same statement to rehabilitate her. We are satisfied that providing Brown's pretrial statement was not improper because the judge reminded the jury that it "should not give it any greater weight than you give to any of the exhibits that have been provided to you previously in the trial," and because, having been provided with the pretrial statement, the jury was able to assess all relevant evidence. *Samad v. United States*, 812 A.2d 226, 233 (D.C. 2002); *Allen v. United States*, 603 A.2d 1219, 1224 (D.C.1992) (en banc).

**10.** Judge Eric Washington was sitting in for Judge Walton.

**11.** Judge Harold Cushenberry was sitting in for Judge Walton.

**12.** When this case was first before us, the transcript of the courtroom proceedings from Monday, November 24, 1997 was not available. It has since been provided to this court, and it confirms that counsel for Gardner lodged no objection to the court's receipt of the verdict.

**13.** The remaining juror was deceased.

**14.** On remand, one of the jurors testified that "the jury did not need the transcript of Mr. Gardner's testimony" in reaching its verdict.

scripts, it instructed them "not to give greater weight just because you happen to have the transcript of one witness that you have requested." The court also reminded the jury that their collective recollection of *all* the evidence presented was to control their decision making process. Because we are presented with no reason to suspect that the jury disregarded or was unable to follow such instructions, we conclude that the receipt of the transcripts was not inherently dangerous. *See Allen, supra* note 9, 603 A.2d at 1224 (jury presumed to follow judge's instructions).

■ Gardner also claims that providing each transcript to the jury as it became available, rather than providing all of the transcripts at the same time, unduly influenced the jury because the jury was able to ruminate over the contents of both government witnesses' transcripts before ever seeing Gardner's transcript, which presumably would have been exculpating. We reject that claim for several reasons. First, no objection was made on that ground, and the transcripts of Hebron and Gardner were not even requested until after the jury had received the transcript of Brown's testimony. Therefore, the court could not have given the jury all three transcripts at once.

■ Nor did the court err in accepting the verdict without first ascertaining whether Gardner's transcript had been received. First, we note that there was no objection to the receipt of the verdict. Second, it is fair to infer, as the trial court explicitly found, that the jury, knowing that Gardner's transcript was forthcoming, was satisfied that it could comfortably return a unanimous verdict without reviewing Gardner's testimony. *See United States v. Young,* 140 F.3d 453, 456 (2d

Cir.1998). Moreover, because we do not know why the jury requested Gardner's transcript, we cannot conclude, as Gardner argues, that the jury would have viewed it as exculpatory or in some way favorable to him. The jury could well have sought Gardner's transcript for some other purpose. In any event, by reaching its verdicts without having reviewed the transcript, the jury was, in effect, saying that it did not need to review that transcript. To that end, "[o]nce the jury announced its readiness to return a verdict, it was up to defense counsel to decide whether to accede to having the verdict promptly announced or to request the Judge to ask the jurors if they still wished the [transcript]." *Id.; State v. Cancel,* 275 Conn. 1, 878 A.2d 1103, 1112–13 (2005) (jury's rendering of verdict suggests it decided that it did not need to rehear testimony); *People v. Gonzales,* 68 Cal.2d 467, 67 Cal.Rptr. 551, 439 P.2d 655, 658 (1968) (en banc) ("jury manifestly decided that the reading of the testimony was unnecessary" when it rendered verdict); *Garden v. State,* 73 Nev. 312, 318 P.2d 652, 655 (1957) (no error where jury returned verdict without waiting for the read-back which they were told would be forthcoming). Because it was incumbent upon Gardner to voice his demand that the jury see his transcript before rendering the verdict,[15] and because he failed to do so, the trial court did not err in receiving the verdict.

For all these reasons, we conclude that the trial court did not err in providing the transcripts as they became available. Nor did the trial court, in its "broad discretion," err in receiving the verdict even though the transcript of Gardner's testimony had not been provided. *Wilson, supra,* 333 U.S.App. D.C. at 119, 160 F.3d at 748.

---

**15.** On remand, counsel for Gardner acknowledged that she took no steps to ensure the jury had access to her client's transcript before returning its verdict.

## B.

■ Gardner next contends that the trial court erred in allowing Drummings to testify about what Johnson said and did each time Johnson returned to the car after talking with Gardner at the gas station.[16] Gardner concedes that his statements made to Johnson would be admissible as statements of a party-opponent if Johnson himself testified about them. *See Akins v. United States,* 679 A.2d 1017, 1028 (D.C.1996). However, because Drummings' testimony was "double hearsay," each level of hearsay must fit within a hearsay exception in order to be admissible. *See Daye v. United States,* 733 A.2d 321, 329 n. 8 (D.C.1999); *see also* FED. R. EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"). Gardner contends that the second level—*i.e.,* what Johnson said to Drummings—is not within any hearsay exception, and that the trial court abused its discretion in admitting that testimony. We are satisfied, however, that the statements Johnson made to Drummings were admissible under the "present sense impression" exception to the hearsay rule.

■ "Hearsay is an assertion of fact or belief made out of court and offered to prove the truth of the matter asserted." *Mercer v. United States,* 864 A.2d 110, 117

(D.C.2004). Statements sought to be admitted under the present sense impression exception to this general rule must have been made "spontaneously and contemporaneously with the events described." *Hallums v. United States,* 841 A.2d 1270, 1278 (D.C.2004) (internal quotation marks and citations omitted). Drummings testified that Johnson and Gardner exchanged heated words, but that ultimately they shook hands. Immediately after shaking hands, Johnson walked back from the Cadillac—which was parked adjacent to the Nissan—and relayed to Drummings the statements which Gardner had made to Johnson. No more than a few seconds could have elapsed between the Gardner–Johnson conversation and the Johnson–Drummings conversation; hence, the statements to Drummings were likely reliable, "because the immediacy eliminates the concern for lack of memory and precludes time for intentional deception." *Id.* The trial court did not abuse its discretion in admitting the testimony.[17]

## C.

■ Finally, Gardner argues that a number of comments that the prosecutor made during the course of the closing and rebuttal arguments were improper. When reviewing claims of improper prosecutorial argument, we first determine whether the challenged arguments were improper. Then, if a timely objection was made and overruled, we decide whether the court's

16. E.g., Drummings testified that "[decedent Chucky Johnson] said that [Gardner] had told [Johnson] the reason [Gardner] had the car was because [Walker] owed [Gardner] some money .... Chucky told me that [Gardner] had told him [that Gardner] thought we was stepping to him."

17. For these same reasons, it was not error to admit Drummings' testimony that Johnson told him that he saw a gun in Gardner's waistband.

Furthermore, because the statements were not "testimonial," application of the present sense impression exception in these circumstances does not violate the Confrontation Clause. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Hammond v. United States,* 880 A.2d 1066, 1100 (D.C.2005); *Roy v. United States,* 871 A.2d 498, 505 (D.C.2005).

error was harmless under the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946);[18] *see Clayborne v. United States,* 751 A.2d 956, 968 (D.C.2000). However, if appellant failed to object, then we review for plain error, in which case reversal is warranted only if the trial judge plainly erred by failing to intervene *sua sponte,* and if appellant's substantial rights were so clearly prejudiced as to jeopardize the fairness of the trial. *Washington v. United States,* 884 A.2d 1080, 1088 (D.C.2005); *Drayton v. United States,* 877 A.2d 145, 149 (D.C.2005). Further, where, as occurred here, there were multiple instances of asserted improper comments throughout the entirety of the government's closing and rebuttal arguments, we determine "whether the cumulative impact of the errors substantially influenced the jury's verdict." *Foreman v. United States,* 792 A.2d 1043, 1058 (D.C.2002).

 Gardner acknowledges that trial counsel failed to object to nearly all of the assertedly improper statements.[19] The question is therefore whether the comments were so improper and prejudicial that the judge was legally obliged to intervene on his own initiative, notwithstanding the lack of a defense objection. Assuming, without deciding, that the comments were improper, we hold that they do not warrant reversal of the conviction under the "plain error" standard. *Drayton, supra,* 877 A.2d at 149; *Foreman, supra,* 792 A.2d at 1058. Even when analyzed in the aggregate, the comments would not have impacted the jury's decision in light of the government's abundant evidence, including testimony that Gardner, while in possession of a pistol, had argued with one of the decedents on the evening of the shooting; the eyewitnesses' descriptions which matched Gardner, and not Walker; the ammunition found on Gardner's person which matched that of the murder weapon; and of course, Gardner's admission that he was present during the shooting.[20]

### III.

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

18. Under that standard, the issue becomes whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[.]" 328 U.S. at 765, 66 S.Ct. 1239.

19. The trial court sustained the two objections that were made and trial counsel did not request any corrective action be taken. No request for a mistrial was ever made.

20. We also reject Gardner's claims that the trial court erred in instructing on second degree murder. "Any evidence, however weak, is sufficient to support a lesser-included instruction so long as a jury could rationally convict on the lesser-included offense after crediting the evidence." *Woodard v. United States,* 738 A.2d 254, 261 (D.C.1999). Here, the element which distinguishes first degree from second degree murder is "deliberate and premeditated malice." D.C.Code § 22–2101. The jurors could have concluded, *e.g.,* that Gardner acted out of impulsive fear when he suddenly came across the decedents in the early hours of February 15th. *See Henderson v. United States,* 678 A.2d 20, 21 n. 2 (D.C. 1996); *(John) Wilson v. United States,* 711 A.2d 75, 77 (D.C.1998).