ZIMMERMAN ET AL., APPELLEES, *v.* CITY OF CLEVELAND, APPELLANT.

(No. 23568—Decided November 23, 1955.)

*Mr. Neil W. McGill, Mr. John H. Ober, Mr. John P. Butler* and *Mr. Anthony C. Carlin,* for appellees.

*Mr. Ralph S. Locher,* director of law, and *Mr. William T. McKnight,* for appellant.

*Per Curiam.* This is an appeal on questions of law from the Court of Common Pleas of Cuyahoga County. The appel-

lants are the city of Cleveland, as a municipal corporation, sometimes hereinafter designated as the city, the regularly constituted members of its civil service commission, sometimes hereinafter designated as the commission, and its director of safety. The appellees are 17 police officers of the city of Cleveland. The appeal is by the city from the findings and judgment of the Court of Common Pleas which reversed the findings and judgment of the commission on the statutory ground that there was "insufficient cause for removal" from office of such officers.

It appears from the record that on February 11, 1954, Frank W. Story, chief of police, suspended from the police force the 17 police officers hereinafter named and, on the same day, notified the director of safety of the fact of the suspension and the alleged cause therefor. Beginning on the fourth and concluding on the eighth day of 1954, each of the 17 police officers was interrogated in the office of the chief of police by question and answer procedure. A transcript was made of each interrogation, and by letter, under date of February 11, 1954, in the case of each of the police officers, the police chief advised the director of safety of his action in suspending each of the police officers and the specifications of charges with respect to the same. Each of the communications was in substantially the same language. Subsequent to the original notification to each of the 17 police officers, two hearings were had before the director of safety, the first of which began February 28, 1954, and terminated March 8, 1954, at which time police officers Zimmerman, Koenig, Weber, Bradic, Julius, Zukie, McNamara, Molle, Primosch, Zimlich and Sepesy were tried as a group. The second group of police officers, which included Weiss, Coyne, McGoun, Moran, Pirronelli and Morgan, were brought before the safety director in a hearing which began on March 15 and ended on March 26, 1954. On April 1, 1954, at the conclusion of both the hearings, the director of safety, in writing, advised each of the 17 police officers separately that he had found the charges as preferred against each and every one of them sustained by the evidence; and the director of safety furnished each police officer with a copy of the order of removal by a letter addressed to each and stated that his grounds for the removal were those contained in his letter addressed to each officer on February 12, 1954.

On April 1, 1954, the director of safety removed 12 of the officers and suspended five by notice in writing of his findings and judgment.

On April 1, 1954, the director of safety notified the commission by separate letter as to each police officer dismissed or suspended by him and mailed to the commission a copy of the order of dismissal or suspension, the original of which had been mailed to each police officer.

Subsequent to the delivery and receipt of the notice above referred to, notice of appeal to the Civil Service Commission of the City of Cleveland was filed on April 12, 1954, by each of the 17 police officers. The commission duly entered on its journal the receipt of the notices of appeal and proceeded to a joint hearing and trial of all 17 officers, over the vigorous objections of all 17 officers to a joint or "mass" trial. The hearing commenced on June 14, 1954, and terminated November 24, 1954.

At the conclusion of the hearing, the commission sustained the director as to the removal from service of seven of the officers, but modified the findings, from dismissal to suspension, of the director as to seven other officers, and modified the order of the remaining three in reducing the period of suspension.

An appeal from the findings of the commission was perfected to the Court of Common Pleas of Cuyahoga County on behalf of each of the 17 police officers. As a part of that appeal, each of the officers assigned 11 grounds of error for the consideration of the Court of Common Pleas.

At the conclusion of a review of the record compiled before the civil service commission and without resort to any other evidence, the Court of Common Pleas ruled as to each individual involved that there was "insufficient cause for his removal."

Thereafter, and within the time allowed by law, the city filed its notice of appeal and bill of exceptions in this court and assigned as grounds of error the following:

"1. The Court of Common Pleas in finding that there was insufficient cause for removal of each and every one of said police officers, erred and the judgment of said court is contrary to law.

"2. The Court of Common Pleas in reversing the findings of the Civil Service Commission of the City of Cleveland removing each of the seventeen police officers or patrolman of the Police Department of the City of Cleveland erred in that said judgment on its merits is against the weight of the evidence."

Proceeding to a consideration of the first ground of error assigned, we find it necessary to review the charges made against the appellees and the procedure adopted in respect to such charges.

It is clear from the evidence that the charge, as originally preferred against the police officers, was a *"charge of gross neglect of duty."* The charges were in writing, originally prepared by the deputy inspector and forwarded to the inspector, his immediate superior. An example of these charges is set forth in a communication, dated February 9, 1954, to the inspector as follows:

"Subject: Neglect of duty charges preferred against Patrolman William Zimlich.

"Sir: I was present at the office of the chief of police at 11:15 a. m., February 4, 1954, during the interrogation of Patrolman William Zimlich in the presence of Chief Story and Inspector Lynch. This interrogation was in regard to the failure of members of the Third District to eliminate a complaint of a house of prostitution at 3821 Prospect Avenue, operated by Joe Cremati. From the interrogation, the answers made, and an examination of the transcript, *I am of the opinion that Patrolman Zimlich is in violation of the following Rules and Regulations of the Cleveland Police Department: Rule 100.* I recommend that these charges be heard by the Chief at his earliest convenience." (Emphasis added.)

Rule 100 of the Cleveland Police Department, which it is charged the officers violated, is as follows:

"Rule 100. Officers, members and employees shall not sleep while on duty. *They shall not conduct themselves in a cowardly manner, nor show such lack of energy as to amount to gross neglect of duty."* (Emphasis added.)

Referring to the record, we find that the chief of police testified that the charges prepared by the deputy inspector were

the original charges under which the entire proceedings began. He testified in part as follows:

"Q. When these men were up for hearing before you on the question of suspension, what was the way the charges started? How did the proceedings begin? A. *Written charges were preferred by Inspector Choura, presented to me through Inspector Lynch.*

"Q. Now, *those written charges came to you as chief, from Choura, but through Inspector Lynch?* A. *That's right."* (Emphasis added.)

The chief of police further testified that the only charge preferred by Choura (deputy inspector), was the charge of violating Rule 100 as follows:

"Q. *So that the charge made by Choura, and the charge transmitted by Lynch to you, was merely violation of Rule 100, wasn't it?* A. *That's right, sir."* (Emphasis added.)

The charges as drawn by Choura were that the officers had been guilty of violation of rule 100, that is, that they had shown "*such lack of energy as to amount to gross neglect of duty."*

Deputy Inspector Choura's supervisor, Inspector Lynch, approved this charge as indicated by letter to the chief of police on February 11, 1954.

That the charges preferred against the officers were violations of rule 100 and only that, is again confirmed by the chief of police, as indicated by his further testimony in the record:

"Q. *Was there anything but Rule 100 submitted by Patrick Lynch to you?* A. *There was not.*

"Q. So *that the charge made by Choura, and the charge transmitted by Lynch to you, was merely violation of Rule 100, wasn't it?* A. *That's right, sir."* (Emphasis added.)

The conclusion is inevitable, therefore, that the officers involved were charged with violation of rule 100, that is, "*gross neglect of duty"* and only "*gross neglect of duty."*

Without going into a detailed analysis of the extended testimony set forth in the record, and at the expense of some repetition, we deem it sufficient to state that the entire record shows conclusively that these men were suspended and charged by the chief of police with violation of Rule 100 and that part of the rule which reads, "*with such lack of energy as to amount to gross neglect of duty."*

The Charter of the City of Cleveland provides in unmistakable terms that the chief of police has the exclusive right to suspend any officers or employees under his control. The same provision likewise applies to the authority of the chief of fire. Section 119 of the Charter provides as follows:

"Section 119. The chief of police and fire chief shall have the exclusive right to suspend any of the officers or employees who may be under their respective management and control, for incompetence, gross neglect of duty, gross immorality, habitual drunkenness, failure to obey orders given by the proper authority, or for any other just and reasonable cause.

"If any officer or employee be suspended as herein provided, the chief concerned shall forthwith in writing certify the fact, together with the cause for the suspension, to the director of the department to whom he may be responsible * * *."

It may be noted that this section of the charter gives the right and power to the chief of police to suspend not only for "gross neglect of duty" but, *inter alia*, "for any other just and reasonable cause." It is certain in this case, the cause for suspension was predicated upon one ground only, namely, violation of rule 100; and the chief of police having heard evidence and having specified his cause for suspension, neither the director of safety nor the civil service commission had any authority under law to change the charges preferred. The text of the letter sent by the chief of police confirms that the cause of suspension was "charges of his being in violation of rule 100 of the rules and regulations governing the division of police." This was again confirmed by Chief Story in further testimony before the commission, to the effect that rule 100 only prohibits gross neglect of duty and that was the basis on which the charges were made and the suspension ordered and certified to the safety director.

The distinction between a charge of gross neglect of duty and simple neglect of duty is also to be found in the testimony of the chief of police, who, in answer to a question, said:

"All members at some time, or nearly every day, commit some slight infraction of the rules which have gone unnoticed, and sometimes are the subject of oral reprimands from the superior witnessing them. Sometimes they are even ignored by

those officers. Those are simple neglects. There is a neglect of duty in my mind which is more serious and this is not performing the duties which they are supposed to do. *I like to think of gross neglect of duty, as the man who wilfully neglects to do his duty.*" (Emphasis added.)

That definition conforms to the legal definition contained in Bouvier's Law Dictionary, page 479, which defines gross neglect as "either an intentional wrong, or such a reckless disregard of security and right, as to imply bad faith, and, therefore, squints at fraud, and is tantamount to the *magna culpa* of the civil law which, in some respects, is *quasi criminal.*" See *Louisville & Nashville Rd. Co.* v. *Robinson,* 67 Ky. (4 Bush), 507.

We find from the record before us that the director of safety did not proceed upon the charges on which the officers were suspended by the chief of police. The safety director instituted new and independent charges against these defendants for simple neglect of duty, and the same mistake likewise must be attributed to the commission. There can be no doubt about this. That fact is forcibly demonstrated by the frank statement before the civil service commission, made by the chief counsel for the city, as follows:

"Mr. White: Before you do that, may I attempt to make one thing crystal clear on behalf of the director of public safety? Perhaps I should consult him, but he is not available for consultation. But I am so sure that this is his ground, that I have no hesitancy in stating it, whether it is for him or against him.

"These men were not found guilty by the director of public safety for sleeping on duty, for cowardice, or for *lack of energy amounting to gross neglect of duty.* They were found guilty of neglect of duty, *and if, in the course of this hearing, you should find that they could only be found guilty under a charge of lack of energy such as amounts to gross neglect of duty, I say to you in open hearing that it is your duty to find that the charges are not sustained, because there is no attempt to prove that charge.*" (Emphasis added.)

In consideration of this admission by counsel on behalf of the director of safety and the evidence in the record, it is manifest that these officers were not tried by the safety director or the commission upon the charges for which they were suspended

by the chief of police. Such action was in violation of applicable law, both as defined in the Charter of the City of Cleveland, the applicable statutes of the state and the established law of Ohio. The provisions of Section 119 of the City Charter clearly limit the authority of the chief of police to suspension only and limit the authority of the director of safety to ''proceed to inquire into the *cause of suspension* and *render judgment thereon*.'' This is also in accord with the statutes of the state, as defined by the provisions of Section 737.12, Revised Code (Sections 4379 and 4380, General Code), the applicable part thereof being as follows:

''The chief of police * * * shall have *exclusive right to suspend* * * * employees * * *.

''If any such employee is suspended, the chief of police * * * shall forthwith certify such fact in writing, together with the cause for such suspension, to the director of public safety, who * * * shall proceed to inquire into *the cause of such suspension and render judgment thereon*.'' (Emphasis added.)

A comment upon this and related sections may be found in 9 Ohio Jurisprudence (2d), Civil Service, Section 150, pages 492 and 493, which we quote in part as follows:

''The pertinent provisions of the municipal corporations law provide that the chief of police * * * shall have the exclusive right to suspend the officers or employees in their respective departments for any of the causes provided therein. Upon doing so, he must forthwith certify to the director of public safety, in writing, the fact of suspension together with the cause therefor. Within a specified time after receipt by him of the certificate of suspension, the director must inquire into the cause of suspension and render judgment thereon. * * *

''*It is apparent that removal requires the action of both the chief of the department and the director of public safety, since the authority of the chief is limited to suspension, and the authority of the director is limited to inquiring into charges upon which the chief has ordered suspension.*'' (Emphasis added.)

The obvious purpose of those and similar provisions is to promote the discipline and efficiency of the police and fire departments by lodging the power of suspension in the chief of police or the fire chief exclusively, and the power of removal on

the charges of suspension with the safety director. These provisions afford a reasonable degree of protection to the members and officers of the police and fire departments under civil service laws, rules and regulations, by granting to them a hearing on the charges as preferred, thus avoiding undue risk of the exercise of arbitrary and tyrannical power by one person or a group of persons to the detriment of civil service. Obviously, the purpose of civil service laws, in addition to establishing a merit system, is to protect employees against unjust charges of misconduct and inefficiency. See 9 Ohio Jurisprudence (2d), Civil Service, 318 *et seq.*, Section 3; *State, ex rel. Moyer,* v. *Baldwin,* 77 Ohio St., 532, 83 N. E., 907, 19 L. R. A. (N. S.), 49; *State, ex rel. Finding,* v. *Kohler,* 11 N. P. (N. S.), 497, 23 O. D., 44; *State, ex rel. Finding,* v. *Kohler* (Circuit Court of Cuyahoga County), 18 C. C. (N. S.), 465, 28 C. D., 284. See, also, *Smith* v. *City of Mayfield Heights,* 71 Ohio Law Abs., 35, 124 N. E. (2d), 761, hereinafter discussed.

In *State* v. *Baldwin, supra,* it was held, under a former statute which gave the mayor the same power as is now possessed by the director of safety, that the mayor had no original jurisdiction to inquire into charges of a member of the police department (except the chief) and that any order of removal which he might issue as a result of such inquiry would be wholly void.

In *State, ex rel. Arey,* v. *Sherrill, City Mgr.,* 142 Ohio St., 574, 53 N. E. (2d), 501, a case arising in Cincinnati, it was held that a municipal charter and municipal code granting to a city manager power to appoint, dismiss, suspend and discipline all officers in the administrative service, including members of the police department, could not prevail against the provisions of the General Code, particularly Section 4380 (now Section 737.12, Revised Code, above quoted), and that a police officer suspended for the claimed violation of certain rules of the police department had a right to insist that the director of public safety inquire into the cause of such suspension and render judgment thereon, regardless of the provision in the city charter or Administrative Code.

Applying the law to the procedure followed in this case, we must conclude that the director of safety does not have juris-

diction to originate or file charges against an officer of the police department; neither does he have the power or authority to alter or change charges upon which the suspension was based by the chief of police.

For these reasons, the proceedings had, both before the director of safety and the commission, were contrary to law and constituted a denial of due process.

Another question with respect to the regularity and legality of the proceedings is raised by the police officers, which challenges the concept of due process of law as applied to these proceedings.

From the very beginning of the trial of this case before the commission, objections were entered by all the police officers here put upon charges to a joint or "mass" trial, which objections were regularly and consistently overruled by the commission.

Each officer was charged separately by the chief of police by a separate letter addressed to each officer individually, and separate letters of notice of suspension of each officer were transmitted to them and to the director of safety, who in turn, notified each officer separately as to the hearing before him and as to the action taken thereon.

There is no claim by the city that "in failing to eliminate the cause of the complaint" at 3821 Prospect Avenue the 17 officers were acting in concert or in furtherance of a conspiracy to defeat honest law enforcement or that they consciously or intentionally acted to permit violation of the law in their district or, in any other way, joined in any act or deed in furtherance of an agreed purpose to neglect or fail in the performance of their duties as officers of the Cleveland Police Department. Furthermore, there is no charge and no evidence that any of these officers was guilty of corruption in any way; and this is so indicated by the following testimony of the chief of police:

"Q. * * * Is there any evidence, so far as you know, that any one of these men was guilty of any corruption, or the taking of any money, or of any bribe, or anything of value as a consideration for leaving Cremati's place stay open? A. There is no evidence or no such charge.

"Q. * * * At any rate, there is no such evidence? A. No, sir.

"Q. And furthermore * * * your knowledge of each of these 17 men is such, is it not, that you personally believe each one of them to be honest, do you not? A. I do."

The record shows that some of these officers are patrolmen, some are lieutenants and some are captains, having varying degrees of responsibility according to rank. Also, it should be noted that their periods of duty in the Third District, which is the area involved, differed substantially as to time and that some were not on duty at times when it is claimed there were neglects of duty. Furthermore, the record is clear, according to the testimony of the chief of police, that there never had been any charges previously placed against any of these officers for negligence, incompetence or dereliction of duty in any manner. In fact, three of these officers, McNamara, Sepesy and Zimlich, had previously been cited for merit pay raises for diligence, efficiency and devotion to duty beyond that normally required or expected, and the merit pay raises were approved by the chief of police and assistant director of safety as late as February of 1953. Furthermore, some of these officers had spent their entire adult lives as members of the police department. The evidence offered by the city in support of its charge of gross neglect of duty against an officer of the police department, in most instances, had no application to like charges against the other officers joined in the trial. Also, during the trial, objections were entered by one or more of the officers as to the competence or admissibility of evidence of specific charges as against the objector or objectors, such objections being overruled on the promise that such evidence would later be connected up with such objecting officer. This was not done.

It is true that in a hearing before an executive, board or commission, greater latitude is allowed than in the trial of a criminal case, in joining defendants who are connected in a general way with the facts of the case, where the commission or board can separate the evidence as it has bearing on each of those charged. Such rule must, however, be circumscribed by reason. At the time this case was tried, a defendant in such a proceeding had a right under the law to appeal an adverse finding or judgment, and such appeal was required to be on the evidence before the commission. Under such circumstances, would

an individual defendant in such a proceeding be required to produce the entire record on appeal at his expense? Or would he, at the risk of having his appeal dismissed for an incomplete record, be obliged to choose that evidence which he concluded was applicable only to him? Here the record was taken over an extended period of time, consisting of over 3,300 pages contained in six volumes, with seven volumes of exhibits, with the evidence so intertwined and interwoven as to make severance as to any one defendant practically impossible.

As heretofore indicated, many of the claimed defaults in performance of duty as to some of the officers took place before others were in any way associated with the case or with the area in question or even with the department.

We do not hold as a matter of law that a municipal administrative body, such as the commission, may not at times join one or more persons in a single hearing where the circumstances are such as to show joint action or a conspiracy or where the conduct as to each of the persons charged can readily be ascertained and determined separately from that of the others. But under the circumstances of this particular case, where there are no charges of corruption, insubordination, or failure to obey orders or to make true reports—in fact no specific charges with respect to any specific acts but only an omnibus charge of "such lack of energy as to amount to gross neglect of duty"— to join all 17 officers charged separately, there being no claim of conspiracy or concerted action between them, puts all those charged at a serious disadvantage of such proportions as to deny each of the accused officers rights of due process to which they are entitled under the law.

Under such circumstances, the convenience of the commission in carrying on a "mass" trial should give way to the superior rights of officers with a long unblemished record of performance of duty in the police department, and a reasonable severance should have been granted. Otherwise, the fundamentals of civil service, imbedded in our Constitution, laws, rules and regulations, afford little or no protection to an upright, honest officer, joined with many others who happen to be members of the same police department, operating in the same district. The dangers of the "transference of guilt," if guilt there be, was pointedly declared by the Supreme Court of the

United States in a case involving criminal conspiracy. In such a case, each person is charged with liability for the acts of another conspirator, once evidence of conspiracy is established, whether he knows of the acts of others or not. Here there is no claim of joint acts, joint torts or joint conspiracy. In *Kotteakos* v. *United States*, 328 U. S., 750, at pages 773, 774, 90 L. Ed., 1557, 66 S. Ct., 1239, it is said:

"Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections * * *.

"* * * The dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place."

In the recent case of *Smith* v. *City of Mayfield Heights*, 71 Ohio Law Abs., 35, 124 N. E. (2d), 761, decided February 23, 1955, by this court (motion to certify overruled June 29, 1955), we held, *inter alia*, that even though one holding a public office does not have a vested right thereto, he is entitled to the protection of the due process of law provisions set forth in the Constitution of Ohio and the Constitution of the United States in any proceeding before a commission to remove him from such office, and that any hearing involving one's rights of whatever nature provided by law must conform to the standards of a fair trial and are subject to the protection of the general rules of fair play which govern society, and this is true whether the hearing is before a court of law, an executive, or a commission, and while, as heretofore stated, nonjudicial bodies, such as commissions, are not expected to be held to the same strict conformity to regular rules in the introduction and presentation of evidence as judicial bodies, they, nevertheless, must not disregard fundamentals having to do with the observance of the safeguards provided every person by the constitutional provisions, federal and state, that no person shall be deprived of life, liberty or property without due process of law.

Therefore, for fatal procedural defects appearing plainly

on the face of the record, the first assignment of error, that the judgment of the Court of Common Pleas was contrary to law, must be overruled, and the finding and judgment of the Court of Common Pleas that there was "insufficient cause for removal," must be sustained.

Counsel for the city have cited the cases of *Sorge* v. *Sutton, Jr., Dir.* (1953), 159 Ohio St., 574, 113 N. E. (2d), 10; and *In re Koellner,* 160 Ohio St., 504, 117 N. E. (2d), 169, indicating that the trial judge substituted his judgment for that of the commission, in support of their claim that it was the duty of the Court of Common Pleas to sustain the findings of the commission as to each officer in this case. We do not so read the record.

It should be noted that the principle issue decided in *Sorge* v. *Sutton* and *In re Koellner* is that the Court of Common Pleas is without jurisdiction to try an appeal from a decision of a municipal civil service commission *"de novo."* This is established by the second paragraph of the syllabus in the *Sorge case, supra,* as follows:

"2. Under Section 486-17a, General Code [Section 143.27, Revised Code], the 'appeal' from a decision of a municipal civil service commission to the Court of Common Pleas, 'to determine the sufficiency of the cause of removal,' accorded members of police and fire departments in the classified civil service contemplates only a review of the proceedings before the commission as to their legality and regularity and to determine the sufficiency of the cause of removal, and not a trial *de novo.*"

Such principle is also stated by paragraphs one and two of the syllabus of the *Koellner case, supra:*

"1. Under Section 486-17a, General Code (Section 143.27, Revised Code), a police captain, who appeals to the Court of Common Pleas from a decision of a civil service commission demoting him to the rank of detective, is not entitled to a hearing *de novo* in the Court of Common Pleas. (*Sorge* v. *Sutton, Jr., Dir.,* 159 Ohio St., 574, approved and followed.)

"2. In such an appeal, it is reversible error for the court to conduct a hearing *de novo* and substitute its judgment for that of the commission, where there is ample evidence in the record of the hearing before the commission to justify its decision of demotion."

But it can not successfully be asserted here that the trial court heard this case "*de novo*." Quite the contrary is true, for this case was tried on the record made before the commission, and on no other evidence.

In this connection, however, it should also be noted that the *Sorge case, supra*, also holds that the hearing before the Court of Common Pleas contemplates a review of the proceedings before the commission *as to their legality and regularity*. This is clearly shown in the syllabus above quoted and the comments of the court throughout its opinion, particularly at pages 578 and 579. At page 579, the court quotes with approval from an opinion rendered by the Court of Appeals of the First Appellate District in the following language:

"The Court of Appeals of the First Appellate District in the case of *Kearns* v. *Sherrill, City Mgr.*, 63 Ohio App., 533, 541, 27 N. E. (2d), 407, 411, considered the same problem we now have, and we are in agreement with the following language used in the opinion in that case:

" ' * * * we hold that the language of Section 486-17a, General Code, must be construed to confer upon that court jurisdiction to review the proceedings of the civil service commission to determine *whether it had exercised the authority conferred upon it in accordance with the statutes, and whether due process of law and other constitutional safeguards had been observed,* thereby excluding from the review the administrative discretion exercised by the appointing officer and the civil service commission.' " (Emphasis added.)

It is clear that in the instant case the Court of Common Pleas confined its decision to a review of the proceedings before the commission and on such review determined that the cause of the removal as to each of the appellees was insufficient. This action was in accordance with the provisions of Section 143.27, Revised Code, and consonant with the dictum of the Supreme Court in the *Sorge* and *Koellner cases* herein cited and quoted.

Considering the second assignment of error, namely, that the judgment of the Court of Common Pleas, on its merits, is against the weight of the evidence, we are clearly of the opinion that the only charge these police officers had to meet in the trial

before the civil service commission was that they were guilty "of lack of energy amounting to *gross neglect of duty*," as the charge was submitted to the chief of police by the commanding officer of the Third District. Upon the admission of the city, that such charge was not and could not be proved, we have stated that as a matter of law alone the judgment of the Court of Common Pleas, to the effect that there was insufficient cause for removal, must be sustained. However, we are unable to determine from the entry journalized by the Court of Common Pleas whether the judgment was predicated upon the irregularity and illegality of the proceedings, including the denial of due process of law, or whether the judgment was predicated upon the evidence alone.

While we think that the legal questions here decided are dispositive of the issues presented, for which reasons alone the judgment of the Court of Common Pleas must be affirmed, we will refer briefly only to certain items of evidence, as it would serve no good purpose to analyze the evidence at length.

Cremati's place was a so-called boarding house, housing from 20 to 40 men of Puerto Rican descent, being laborers engaged in work here, but a reading of this record leaves no doubt that Cremati's place was also used for illicit purposes and a festering sore upon society. It has long since been closed, and Cremati was convicted of a heinous felony, forcible rape upon a minor, which conviction was affirmed by this court. The record raises a serious question as to the responsibility for the existence of the illicit operations at this place. It is admitted in the record that the police officers and patrolmen joined in this action under omnibus charges did not have the authority to determine the policy of law enforcement in their district, being obligated only to execute policy determined by their superior officers. It is clear from the record that superior authority determined upon a policy of harassment which means that frequent visits should be made by police officers to a suspected place of gambling or prostitution on the theory that the fact that police officers go in and out of the place at frequent intervals will so annoy and disturb the patrons that it will eventually be unprofitable and be forced to close. This policy of harassment by frequent visits to a suspected place in the Third District was

not limited to the officers charged but included also members of the vice squad who were not charged and included all officers up to and including captains, and this policy was in effect throughout 1951, 1952, 1953 and January of 1954.

For these reasons, the trial judge could have found from the evidence that the police officers involved were pursuing the policy established for them by their superior officers in making frequent visits to the Cremati place. The chief of police defined the policy of harassment, as shown by the record, as follows:

"Q. Well, the long and short of it is that it is thought that if there is a procession of police officers waltzing in and out of the place, the ordinary customers might be a little embarrassed and take their business somewhere else? A. That's right."

He testified that the same duty was imposed upon the plain clothesmen. The inspector likewise testified to the same effect.

This policy of harassment was continuously in effect during the stated years, even though the inspector in charge of the district conceded that Cremati's place could have been effectively closed by placing one policeman in uniform on the premises. This was admitted in the following testimony of the inspector, as follows:

"Q. Inspector, I put a question to you in the hearing we had before Director McCormick. I would like to put it to you again to see if your answer is the same. The question was: 'If you put the worst policeman that you know of in the department, in Joe Cremati's place from nine in the morning until nine at night and he left his suit on, and stayed awake, the place would close, wouldn't it?' And you answered 'It certainly would.' Would that be your answer today? A. Yes."

From this testimony in the record and upon a review of the entire evidence contained in the record, when considered in the light of all the surrounding facts and circumstances and the orders which those charged were directed to carry out by their superior officers, we conclude that it can not be said that the trial court abused its discretion or that the judgment of the Court of Common Pleas was contrary to the manifest weight of the evidence in holding that there was "insufficient cause for

194

removal" or suspension of the 17 police officers from their positions as such officers.

Holding these views, we affirm the judgment of the Common Pleas Court.

*Judgment affirmed.*

KOVACHY, P. J., HURD and SKEEL, JJ., concur.