**STATE of Missouri, Respondent,**

v.

**Jonas BUTLER, Appellant.**

**No. 57402.**

Supreme Court of Missouri, Division No. 1.

Nov. 12, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

Robert C. Ely, St. Louis, for appellant.

WELBORN, Commissioner.

Appeal from judgment and sentence of life imprisonment on jury verdict finding Jonas Butler guilty of murder in the first degree.

On March 25, 1971, at around 6:00 P.M., three men entered the Parkhurst Food Shop, located on North Taylor in the City of St. Louis. One man stayed near the entrance and the other two went to the meat counter at the rear of the store. The proprietor, Herman Kramer, was at the front of the store. The actions of the three caused him to be suspicious and, on a ruse, he left the store to call the police.

Rachel Kramer, the proprietor's daughter, waited on one of the two men at the meat counter. She sliced a half-pound of ham and gave it to the man, who complained about the price. Rachel removed a portion of the contents of the package and handed it to the man and left the store and went to the restroom in the rear.

After Herman and Rachel had left the store, one of the men at the meat counter pulled a pistol and held it at the head of Herman's wife, Edith Kramer, who was standing near the meat counter, and demanded the money in the kitchen. Edith told the man there was no money in the kitchen and he pushed her toward the front of the store.

Herman's brother, Paul Kramer, an off-duty policeman, was also in the store and had gone toward the front to check out the customer. The man who had stood at the front of the store and who was subsequently identified by the Kramers as Jonas Butler demanded that Paul give him the money in the cash register. Paul opened the cash register and gave the money to one of the men. The man identified as Butler asked Paul for the money in his pocket. Paul put his hand in one pocket and Butler said, "No, I want it out of the other pocket." When Paul reached into the other pocket, Butler, according to Mrs. Kramer, fired twice a pistol he was holding and Paul fell, mortally wounded. The three men left the store. Herman saw them leaving as he was returning to the store and attempted unsuccessfully to follow them.

Investigating policemen received information that Butler was involved in the robbery and killing. Rachel and Edith were shown photographs of Butler, but did not on that basis identify him as one of the robbers. On April 8, 1971, Butler was placed in line-ups which were viewed by the Kramers. Rachel and Edith viewed one line-up and Herman viewed a later one. Rachel and Herman picked Butler out of the line-up. Edith testified that she also did. The officer who conducted the line-up testified that Edith made no identification at the line-up. Similar testimony came from an assistant public defender who was present on behalf of Butler.

Butler was charged with murder in the first degree and his trial was held in the St. Louis Circuit Court in September, 1971. The evidence linking Butler to the crime

was the eyewitness testimony of the Kramers. The three made in-court identification and each testified to the line-up identification. There was no physical evidence linking Butler to the crime. Butler testified in his own behalf and denied participation but was unable to account for his whereabouts at the time of the offense.

James Huck, an attorney for the Public Defender Bureau, was called as a witness for the defendant. He had attended the April 8, 1971 line-up, viewed by Rachel and Edith Kramer. He testified that, prior to the line-up, both of them told him that they had been shown pictures of Butler while they were waiting for the line-up to be held. He testified that he watched as each of them observed a six-man line-up, in which Butler was the fifth man from the left. He testified that Rachel stated that No. 6 looked like one of the robbers and that No. 5 (Butler) looked like one when he turned sideways. He testified that Edith made no identification of Butler but stated that "No. 3 may be him." Butler was not No. 3 in the line-up Huck saw. Huck also testified that Butler was two inches shorter than any of the other five men in the line-up.

On cross-examination, Huck was shown Exhibit 2, a photograph of a six-man line-up. This photograph had originally been identified by Herman Kramer as the line-up from which he picked Butler. Butler was the third man from the left in the photograph. Rachel Kramer testified that Exhibit 2 depicted the line-up she viewed. Detective Cox, who was in charge of the police investigation and who conducted the line-ups, was shown an exhibit which he stated depicted the line-up viewed by the Kramers. The question directed to Cox does not identify the exhibit by number, but at that time Exhibit 2 was the only exhibit which had been marked as such and which depicted a line-up.

Huck stated that he would not say that Exhibit 2 depicted the line-up which he saw. When counsel for defendant objected to interrogation of Huck on the basis that Exhibit 2 depicted the line-up he attended, cross-examination was permitted on the basis of the testimony of each of the Kramers and Cox that this was the line-up, despite counsel's argument that Rachel and Edith had not viewed the same line-up as Herman saw. The following then occurred on cross-examination of Huck:

"Q. Do you see Jonas Butler on that picture?

"A. Yes, sir.

"Q. Is he the No. 5 man, as you said?

"A. No, sir.

"Q. Where is Jonas on that picture?

"A. No. 3.

"Q. He is the No. 3 man, isn't he?

"A. Yes, sir.

"Q. That man standing next to Jonas in the striped sleeves, was he in that line-up over there?

"A. I don't know, sir, all I have is names and ages.

"Q. Take a look at his picture, can you tell me if he was in that line-up you saw over there?

"A. I can't tell, sir.

"Q. Is he two inches shorter than Jonas Butler, the one in the striped shirt?

"A. From the picture I would say no, he is not.

"Q. He is a little shorter, isn't he?

"A. I wouldn't say he is shorter, no.

"Q. Would it be a fair statement to say they were the same size?

"A. Approximately, yes.

"Q. Certainly not two inches taller, isn't that true?

"A. No, sir.

"Q. Isn't that true he is not two inches taller?

"A. No, he is not two inches taller."

After Huck testified, Cox was recalled as a witness for defendant and testified that different persons were in the line-up viewed by Rachel and Edith and that viewed by Herman. On cross-examination after Cox had been excused to obtain a photograph of the second line-up, Cox identified a photograph marked Exhibit 13 as a photo of a five-man line-up viewed by Herman. Butler was in the line-up depicted by Exhibit 13. Cox testified that Exhibit 2 depicted the line-up viewed by Edith and Rachel. Butler was the No. 3 man in Exhibit 2. Cox testified at that time that to his knowledge Butler was not in another line-up, not related to the Kramer case, on April 8.

Huck was then recalled by the state for further cross-examination. Huck stated that neither Exhibit 2 nor Exhibit 13 depicted the line-up he attended. The cross-examination emphasized that Butler was No. 3 in both Exhibits 2 and 13, and that Huck had heard Edith say "No. 3 may be him."

In his closing argument, defense counsel argued that the identification of defendant was a matter of reasonable doubt. He argued particularly that the failure of Edith, the only person in the store throughout the incident, to identify Butler at the line-up, should give rise to reasonable doubt of defendant's guilt.

In closing, counsel for the state argued:

" * * * The Kramers, you will recall from the testimony, never picked out anybody from any line-up other than Jonas Butler. This is a very important thing. This goes to the crux of his whole theory and his whole argument. Cox does not consider an identification until such time, and he so testified, that the witness looks at the line-up and says, 'That's him.' That's what they call a 'pick-out.' That's when you pick somebody out of the line-up. No one but Jonas Butler was ever picked out of that line-up. They said some of the other men looked familiar, that's not enough, ladies and gentlemen. That's not enough, ladies and gentlemen. As I said to you before, that's not enough because she says the No. 3 man looked familiar. I don't care which way you count from—down here is No. 3, according to Huck, she says No. 3 looked familiar and that is not picking a man out of a line-up. And this is where the argument comes in for the defense. Cox says Edith Kramer did not make an identification because all she said was the man looked familiar."

The assistant circuit attorney further argued:

"And what did Huck say. He said they referred to the No. 6 man. There isn't any 6 in this picture at all. There isn't any 6 in this picture at all. There isn't any 6 in this picture and Huck did say what Edith told him—the No. 3 man looks familiar—the No. 3 man and the only No. 3 man is the defendant Jonas Butler."

In further argument, again regarding witness Huck, attorney for the state said:

" * * * What better record could you get than the pictures showing how they were standing? Would you rather have the officer come in and say to you from some scribbled notes, 'That man was here, that man was there,' such as Huck did—when you have the photographs themselves to show how they were standing and the exact height of the men. Two men in the middle looked to me, and I am sure to you, to be about the same size. But in any event Jonas Butler is not the No. 6 man. And in any event, there are no six men on this photograph here."

The jury returned a verdict of guilty.

In his motion for new trial, defendant alleged that, on the basis of newly discovered evidence he had concluded that either or both of Exhibits 2 and 13 did not depict the line-ups actually viewed by the Kramers and that the erroneous use of the photo-

graphs deprived defendant of a fair trial, inasmuch as the photographs had been relied upon materially by the state in its presentation and argument and in the state's attack upon the credibility of witness Huck.

A hearing was held on the allegations of the motion. Detective Cox testified that Butler was viewed in a line-up on April 8 in connection with a tavern robbery, not connected with the Kramer case. Cox had no record of the identity of any of the persons who appeared in the various line-ups. He got Exhibit 13 from the photograph lab in response to a request for photos of line-ups in which Butler appeared on April 8. He said that he thought that the same line-up was used for the tavern case as that shown by Exhibit 13. The tavern line-up was held prior to the Kramer line-ups and Exhibit 13 depicted the second Kramer line-up.

James Huck testified that he had made notes of the names of the six persons in the line-up he attended which was viewed by Rachel and Edith. They were: (1) Orlando Crockett, (2) Arthur Jones, (3) Dewey West, (4) Doug Sander, (5) Jonas Butler and (6) Grover McKinney. He was positive that Butler was No. 5 in the line-up because he specified the order and his practice was to place the suspect next to the last.

George Hubel, a member of the staff of the Public Defender's Office, testified that he attended the line-up viewed by Herman Kramer and that the persons in that line-up were: Dewey West, Melvin Mitchell, Arthur Jones, Jonas Butler and Grover McKinney.

As counsel for defendant pointed out to the trial court, the notes of the representatives of the Public Defender's Office show that West, Jones, McKinney and Butler appeared in both line-ups viewed by the Kramers. Examination of Exhibits 2 and 13 shows unquestionably that Butler is the only person who appears in both photographs.

In a memorandum opinion, the trial court concluded that Herman Kramer obviously erred in stating that he viewed the six-man line-up pictured in Exhibit 2. However, the court made no finding on the question posed by defendant as to whether or not either Exhibit 2 or 13 actually pictured a line-up viewed by the Kramers. The essence of the trial court's conclusion was that there had been a proper line-up identification of the defendant.

In this court, the respondent has directed its attention primarily to the question determined by the trial court, i. e., the legality of the line-up proceeding. The thrust of appellant's argument, however, is that the use by the state of photographs which did not actually depict the line-ups involved in this case was so prejudicial to the defense that defendant was thereby deprived of a fair trial.

The state in its brief acknowledges that an error was made in the identification of State's Exhibits 2 and 13 as line-ups viewed by the Kramers. The state concedes that "apparently" one of the exhibits depicts a line-up not involved in the Kramer case, although it does not specify which was the erroneously identified exhibit. In making such concessions, the state obviously gives credence to the testimony of at least one of the public defender assistants who testified on the motion for new trial. Of course, if credence is given the testimony of both assistants, neither Exhibit 2 nor Exhibit 13 pictures a Kramer line-up.

The state does not attempt to counter the argument of appellant that the erroneous identification of the line-up photographs permitted the state in cross-examination and closing argument to destroy quite effectively the credibility of defense witness Huck. The prosecutor was, in fact, able to turn the testimony of Huck in the state's favor by argument based on Huck's testimony that Edith said, "No. 3 man looks familiar," by using the photograph which showed Butler No. 3 man in both Exhibits 2 and 13.

The state's response to appellant's argument is that there was adequate evidence based on the witnesses' unequivocal identification of appellant to convict the appellant and, therefore, the mistake in the identification of the line-up photographs "was not substantially prejudicial to appellant, and did not affect the outcome of his trial."

The authorities advanced by the state in support of this proposition are civil cases which need not here be discussed and otherwise distinguished. Of course, on an appeal in a criminal case, the judgment should not be reversed unless the error complained of was prejudicial to the defendant. State v. Spencer, 472 S.W.2d 404 (Mo. 1971). However, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Here the state's case was based upon eyewitness identification. The defense was the possibility of doubt as to such identification. Edith Kramer was the eyewitness with the greatest opportunity to observe the participants. She was present throughout the occurrence. Herman left shortly after the robbers entered the store. Rachel was concerned primarily with the persons other than the one identified as Butler and she too left the store area. In view of the attention given in the testimony and particularly in the closing argument of the state to the bearing which the line-up photographs had upon the credibility of the state's witnesses and the lack of credibility of the defense witness, there is no way in which it can be said that the use of the erroneously identified photographs was not a matter of substantial influence.

Reversed and remanded.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.