**UNITED STATES of America**

v.

**Joseph WASSNER and Leonard Wassner, Defendants.**

**No. 91 Cr. 0569 (KTD).**

United States District Court,
S.D. New York.

Feb. 6, 1992.

· Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Robert J. Cleary, Asst. U.S. Atty., of counsel), New York City, for U.S.

Stillman, Friedman & Shaw, P.C. (Charles A. Stillman, of counsel), New York City, for Joseph Wassner.

Andrew M. Lawler, P.C. (Andrew M. Lawler, of counsel), New York City, for Leonard Wassner.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge:

In this criminal case, the government charges defendants Joseph and Leonard Wassner with conspiring to violate Internal Revenue Laws. Three of the Wassners' alleged co-conspirators, Schnejer Zalman Gurary, Nochum Sternberg and Esther Sternberg, have already been convicted. No other alleged co-conspirators were charged in this indictment. The government now moves *in limine* for (1) a ruling

on the admissibility at trial of certain evidence;[1] (2) an order requiring the defendants to give further handwriting exemplars; and, (3) a *Curcio* hearing.

## FACTS

Rather than rehash the facts of the instant case, I will set out the pertinent portions of the government's memorandum:

### "I. FACTUAL BACKGROUND

This prosecution is a "spin-off" of *United States v. Gurary, et al.*, 86 Cr. 553 (JMW). On March 9, 1988, Schnejer Zalman Gurary and his co-defendants, Nochum Sternberg and Esther Sternberg, were convicted after trial on forty-four criminal tax charges. Their trial lasted six weeks before the Honorable John M. Walker, then-United States District Judge. The convictions were affirmed on appeal. *United States v. Gurary*, 860 F.2d 521 (2d Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). The Sternbergs and Gurary were sentenced to varying terms of imprisonment and have served those sentences. Esther Sternberg and Nochum Sternberg are Gurary's daughter and son-in-law.

#### a. *Overview*

The *Gurary* trial proved that Gurary and the Sternbergs perpetrated a massive fraud on the public fisc by selling more than $136 million worth of phony invoices from shell corporations they controlled to over 200 businesses in New York City's Garment Center and elsewhere. This far-flung scheme facilitated the filing of false tax returns by scores of Garment Center companies and individuals.

#### b. *The Scheme*

Between 1978 and 1986 Gurary and the Sternbergs created and controlled approximately thirty-six companies (the "Zalga companies") based in New York City's Garment Center, which purported to be engaged in the sale of textiles and other merchandise to legitimate businesses. Gurary and the Sternbergs (collectively, the "Zalga defendants") sold to the principals of certain businesses in the Garment Center and elsewhere (the "invoice-purchasing companies") sham invoices falsely reflecting that a Zalga company had sold goods to the invoice-purchasing company. The principals of these invoice-purchasing companies would then draw a check on their company, payable to a Zalga company, which they would give to Gurary or the Sternbergs. The Zalga defendants then gave the principals cash (or bearer bonds) in the amount of the check less a "commission" of five to fifteen percent which was retained by the Zalga defendants. The Zalga invoices stated that a Zalga company had sold goods in the amount of the check received, but in fact, the invoice-purchasing companies did not receive and had no intention or expectation of receiving any goods from the Zalga company. As designed by the Zalga defendants, the invoice purchasers recorded the sham invoices in their books and records as legitimate purchases of goods. The Zalga defendants deposited the checks received from the invoice purchasers in bank accounts held in the names of the individual Zalga companies.

The tax consequences of this scheme were two-fold. First, the purchases reflected on the false Zalga invoices were recorded on the invoice-purchasing companies' federal income tax returns for the relevant fiscal year as part of the cost of goods sold and the cost of merchandise bought for manufacture and sale by the

---

**1.** The government seeks a ruling on whether the following three categories of evidence will be admissible at trial: "(1) activities of defendants co-conspirators in conducting a massive tax fraud by selling phony invoices to third parties, ...; (2) statements made by the co-conspirators/invoice sellers, as statements against penal interest ...; and (3) testimony of a witness who will claim a Fifth Amendment privilege on a purely collateral matter." Government's Memorandum of Law in Support of Its Pre-trial Motions at 1 [hereinafter "Government's Memo at ___"]. So I could put the evidentiary questions at issue here in context, I ordered the government to turn over to me all the Section 3500 material for the trial. The government has done that.

companies. Thus, the amounts on the sham Zalga company invoices were fraudulently deducted from the amounts of the invoice-purchasing companies' gross receipts, thereby reducing the companies' tax liability. Second, the principals of the invoice-purchasing companies kept for themselves all or a substantial portion of the cash they had received from the Zalga defendants, but failed to report it on their individual income tax returns.

Gurary was the decision-maker in the scheme, exerting authority and control over the Zalga companies themselves, and everyone associated with them. He set the amounts of the commissions paid by the invoice-purchasing companies, and he recruited and supervised two individuals who sold phony invoices for the Zalga companies.

Nochum Sternberg was the salesman and delivery man. He arranged the details of transactions with particular invoice purchasers, including the amount of invoices and cash to be purchased, and the method and time of delivery of the invoices and cash. Esther Sternberg, who worked out of the family house in Crown Heights, acted as the bookkeeper for the Zalga companies. She created the invoices, dealt with invoice-purchasing companies regarding the preparation and delivery of invoices, spoke with bank employees about Zalga company bank accounts, and kept track of expenses incurred in connection with the scheme.

#### c. *The Zalga Companies*

Gurary began creating Zalga companies as early as July 16, 1973. He and Nochum Sternberg continuously created new Zalga companies and dissolved old ones, with the average life of a company being one to two years. This rotation of the companies was done to avoid detection of the scheme.

Oriole ("Al") Mayo acted as a "middleman" for the Zalga companies, finding new invoice purchasers and servicing existing accounts. He personally sold invoices for approximately thirty of the Zalga companies. When it was time to retire old Zalga companies and create new ones, Mayo and

Gurary thought up the names for the new companies. Some of the names, such as Almax Continental, were derived from Al Mayo's (or his relatives') names. Some of the names came from abbreviations of Gurary's middle and last names (such as Zalga International Enterprises, Inc., Zalga Marengo Textiles, Inc., Zalga Metropolitan Textiles Corp.), or from Nochum Sternberg's initials (such as NS Textiles and ENN ESS Textiles). The Zalga defendants never used their own names on papers incorporating or dissolving a Zalga company; they always used aliases or nominees. During the duration of the invoice purchasing scheme, the Zalga defendants and the Zalga companies had no goods for sale, no delivery trucks, no warehouses to store textiles, no employees, and no showroom to display goods for sale. In short, the Zalga companies had no real business other than the sale of phony invoices and cash for a commission. In fact, Gurary and the Sternbergs knew absolutely nothing about the textile business.

#### d. *The Zalga Company Bank Accounts*

Just as the Zalga defendants created shell companies on a rotating basis, so they simultaneously opened bank accounts for individual Zalga companies to deposit the checks they received from invoice purchasers. The Zalga defendants began opening those bank accounts as early as 1973. There were a total of fifty-five accounts for thirty-six Zalga companies between 1978 and 1986. The Zalga company bank accounts were typically active for one to two and one-half years.

While the accounts were open they were extremely active. Gurary and Nochum Sternberg visited the banks on a regular basis, both depositing checks and obtaining official bank checks in large amounts to send the funds deposited in the Zalga companies' accounts to Swiss banks. Many of the official checks were payable to a Swiss bank account called "Zalgura Agency," again, a name adapted from abbreviations of Gurary's middle and last names.

For each Zalga company bank account, the bulk of the disbursements were in the form of an official bank check drawn on the alga company and payable to a Swiss bank account. Through this means, the Zalga defendants transferred approximately $158 million from the Zalga domestic bank accounts to Swiss bank accounts. There were no checks written by the Zalga companies to purchase goods for resale or to manufacture goods.

### e. *The Zalga Company "Offices"*

Gurary and the Sternbergs conducted their invoice-selling business from several different locations in order to reduce the chances of being detected. Initially, for two or three years after 1978, Gurary and the Sternbergs sold invoices from their home at 601 Lefferts Avenue, Brooklyn, New York. The Zalga defendants also maintained offices at various times for the Zalga companies in Manhattan, at 160 Broadway, on West 59th Street, on 47th Street in the diamond center, at 1385 Broadway, and at 350 Fifth Avenue, the Empire State Building. Each of these offices was a barren space containing a desk, a phone, an adding machine, a "wall full of invoices," rubber stamps used to endorse the checks, and a safe. None of these offices ever showed any indication that goods were in fact being sold there. In no way did the offices resemble a typical Garment Center showroom.

### f. *The Middlemen Employed By the Zalga Defendants*

The Zalga defendants employed two middlemen, Al Mayo and Irving Katcher, to recruit new invoice purchasers and service existing accounts in exchange for a cut of the commission the invoice purchasers paid.

#### 1. Al Mayo

In the late 1970's, Oriole ("Al") Mayo, a businessman in the Garment Center for over fifty years, began to purchase false invoices from a man named Simon Laufer. After Mayo had purchased a few fictitious invoices from Laufer, Laufer introduced Mayo to Gurary and told Mayo that from then on, if Mayo needed cash, he should contact Gurary. About six months after Mayo began purchasing phony invoices from Gurary, Gurary asked Mayo if Mayo would be interested in selling cash and invoices for him. The two agreed that Mayo would sell the false invoices for Gurary and that Gurary would pay Mayo a commission.

Under this arrangement, from the late 1970's to the middle of 1985 (approximately eight to ten years), Al Mayo recruited invoice purchasers and sold them phony Zalga company invoices. During that period, Mayo sold false invoices and cash to approximately fifty businesses for Gurary. Mayo earned up to $40,000 in commissions per year from this activity. The procedure Mayo usually followed was to have the purchaser provide him with a check drawn on the purchaser's company for whatever amount the purchaser wanted on the Zalga company invoice. Mayo provided either Gurary, Nochum Sternberg, or Esther Sternberg with the customer's name and what the customer wanted printed on the invoice, and they then gave Mayo a Zalga company invoice containing the requested information. Upon receiving a check from the invoice purchaser, Mayo gave it to either Gurary or Nochum Sternberg. Either Mayo or Nochum Sternberg then delivered the false invoice and the cash (less the commission) to the invoice purchaser.

According to Mayo, Gurary ran the invoice-purchasing operation and "had the last say on anything." Mayo met Nochum Sternberg in 1980 and dealt directly with him in selling false invoices between 1980 and 1985. Mayo saw Nochum Sternberg two to three times a week. Nochum Sternberg delivered cash and invoices to Mayo for Mayo to deliver to his customers; delivered cash and invoices to Mayo's customers; and also delivered cash and invoices to his own customers. Sternberg delivered the cash in a shopping bag or satchel. The Zalga defendants also kept large amounts of cash in the basement of their house in Brooklyn, and on occasion, purchasers picked it up there. Mayo spoke to Esther Sternberg two to three times a week about false invoice transactions. Mayo discussed

with her the details of the invoices, including how much the invoice was for, who it was for, and what dates and contents were to be typed on the invoice. Esther Sternberg also kept track of how much business Mayo had done and what commissions he had earned.

As to each of the fifty companies to whom Mayo sold invoices for Gurary, Mayo made arrangements for the fraudulent transaction with a principal of that company. Frequently, after a few transactions with a new invoice purchaser, Mayo introduced Nochum Sternberg to the principal and Nochum handled the transaction thereafter.

In order to cut back on the commissions they had to pay Mayo, Gurary and Nochum Sternberg frequently cut Mayo out by approaching the invoice-purchaser directly and offering to sell invoices at a lower commission if Mayo were excluded.

### 2. Irving Katcher

Irving Katcher also acted as a middleman for Gurary and the Sternbergs, recruiting invoice purchasers and selling phony invoices between 1979 and 1986. In that period, he sold invoices in the name of twenty to twenty-five Zalga companies.

Like Mayo, Katcher was introduced to Gurary by Simon Laufer. Gurary proposed that Katcher buy false invoices from him and receive cash, less a commission. In making this proposal, Gurary told Katcher that he could "save money on taxes" and "get the dollar amount back and use it either to pay off buyers or expand your business or keep it personally." Katcher ordered several false invoices from Gurary, and Nochum Sternberg gave Katcher the amount of the checks in cash less a commission.

Following these transactions, Katcher began selling false invoices for Gurary and the Sternbergs in the late 1970's. Between 1979 and 1986, Katcher sold false invoices to nine companies. The procedure Katcher followed was similar to Mayo's. Katcher would call Gurary or Nochum Sternberg and place an order for cash in code, referring to dollars as "yards." Katcher then delivered to the purchaser an invoice and cash, which he concealed in his socks, in the amount of the invoice purchaser's check less a commission. Katcher received a commission of approximately two percent for selling the false invoices. Between 1979 and 1986, Katcher realized approximately $40,000 in income from these commissions.

During this period, Katcher regularly met with and spoke to both Gurary and Nochum Sternberg about the scheme. He received the cash usually from Sternberg, but on occasion from Gurary. Katcher also saw Gurary and Nochum Sternberg selling invoices themselves. Katcher frequently spoke to Esther Sternberg on the phone, employing the same code he sued with Gurary and Nochum Sternberg: saying "yards" when he meant "cash." He picked up cash from Esther at her home on one occasion.

### g. *Gurary's Largest Customer, Irwin Feiner*

In the early 1980's, Irwin Feiner was the principal of a women's apparel company called Ahead By a Length. During the period of April 1980 through January 1983, Feiner was the biggest Zalga customer, purchasing approximately $26 million in phony invoices.

In early 1980, Mayo sold a few phony Zalga invoices to Feiner. On one occasion shortly after Feiner entered into the scheme, Nochum Sternberg delivered the cash instead of Al Mayo. Sternberg explained that he was involved in the Zalga companies, and that from then on he would deliver cash and invoices to Feiner. Sternberg said that Mayo's commission would be "taken care of." From that point in 1980 to early 1983, Feiner bought phony Zalga company invoices directly from Gurary and the Sternbergs.

Each time Feiner wanted cash and invoices, he called Nochum Sternberg, who would give Feiner the name of a Zalga company to whom he would make the check payable. Feiner then gave Sternberg the check, which was drawn on the account of Ahead By a Length. Usually

Sternberg delivered the cash to Feiner, although sometimes Feiner sent his driver to the homes of the Zalga defendants to pick up cash.

Feiner met Gurary several months after he began purchasing invoices through Nochum Sternberg and had several conversations with Gurary about nuances of the invoice-purchasing scheme. For example, Feiner initially paid the Zalga defendants a commission of six to eight percent, but as the volume of Feiner's purchases increased, Gurary agreed to reduce the commission. In 1981, Feiner asked Gurary if he could provide bearer bonds instead of cash, and Gurary agreed to do so. When Feiner discussed with Gurary and Nochum Sternberg the fact that they might get caught because they had no goods to sell, no trucks, and no evidence that they were selling actual products, Gurary told him not to worry. Gurary also sold Feiner a device to determine whether Feiner's telephone was tapped. Nochum Sternberg offered to pay Feiner a commission if Feiner recruited new invoice purchasers.

Feiner also dealt with Esther Sternberg. She sometimes answered the phone at the number Nochum Sternberg had provided, and they discussed the phony invoices. Feiner saw Esther Sternberg at the Zalga offices on two or three occasions. Feiner's secretary, who handled the cash and invoices, spoke to Esther Sternberg about correlating the amounts on the checks with the amounts on the invoices. Feiner's bookkeeper spoke to Esther Sternberg by phone about the invoices. The bookkeeper told Esther Sternberg that she should type the invoices as "finished goods" (*i.e.,* completed garments) rather than "piece goods" (*i.e.,* fabric to be used in the manufacturing process), since Ahead By A Length did not purchase piece goods in its business; Esther Sternberg agreed to do so.

## II. THE CASE AGAINST THE WASSNERS

The Zalga companies' second largest customer was a Garment Center company called Arnav Industries, Inc., a business controlled by Joseph Wassner and Leonard

Wassner. The Wassners purchased almost $20 million in phony invoices from Gurary and the Sternbergs during the period 1981 through 1985. Significantly, Gurary and the Sternbergs are the only people identified thus far who dealt directly with the Wassners in this fraud scheme. Gurary and the Sternbergs have defiantly refused to testify before the Grand Jury investigating this matter. The Sternbergs have been held in contempt for disobeying Judge Pollack's order that they testify. Gurary has claimed that he is too ill to testify before the Grand Jury and is undergoing medical tests in an attempt to substantiate that claim. His lawyer has informed the Government that even if deemed healthy enough to testify, Gurary will adamantly refuse to do so.

Because the Wassners' co-conspirators—Gurary and the Sternbergs—are protecting the Wassners by contemptuously refusing to testify, the Government is forced to prove its case through indirect and circuitous means. Through their attempts to shield their phony invoice customers from criminal liability, Gurary and the Sternbergs—not the Government—have created the series of evidentiary issues that are addressed below. These problems illegally hamper the Government's efforts to prosecute this fraud."

Government's Memo at 2–14 (footnotes and cross-references omitted).

## DISCUSSION

■ Apparently, now that Gurary and the Sternbergs have refused to testify against the Wassners, the government has no direct proof to sustain a conviction. Instead, the government seeks to put before the jury proof that Gurary and the Sternbergs were criminals and that others who dealt with them were criminals. From this evidence, the government would ask the jury to infer that the Wassners must be criminals since they associated with people who, in turn, associated with Gurary and the Sternbergs.

To prove its case, the government seeks a ruling that evidence of wrongdoing not charged in this indictment, and involving

only Gurary and the Sternbergs, should be admitted to prove the charges against the Wassners. Essentially, the government wants me to *assume:* (1) that the charged conspiracy existed, and (2) that the government does not have to prove the conspiracy charge just because three co-conspirators will not testify against the Wassners. Stripped of the sophistry surrounding its arguments, the government proposes to wage a trial of guilt by mere association.

To my mind, the Supreme Court decision in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), prohibits just what the government seeks to do here. That case involved eight separate conspiracies which stretched out like the spokes of a wheel from one hub—a defendant named Brown. Each of the eight conspiracies had the same purpose. All the defendants were indicted for one conspiracy. The proof was overwhelming that Brown and the others were guilty of the various conspiracies they were involved in. They were tried together, and the trial judge submitted the case to the jury as if there could only be one conspiracy. The Court reversed the conviction saying:

> The dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to a substantial right has not taken place.

*Kotteakos,* 328 U.S. at 774, 66 S.Ct. at 1252.

The instant case is remarkably similar to *Kotteakos.* Here, Gurary and the Sternbergs are the hub of the wheel (like Brown in *Kotteakos* ) and the Wassners one of the wheel's spokes. Unlike the prosecution in *Kotteakos,* however, the government here has no direct proof of the Wassner conspiracy and its circumstantial proof is far from overwhelming. The evidence which the government seeks to introduce here would only constitute proof of the *other* spokes in the wheel. In fact, the government recognizes that, without proof of the co-conspirators' wrongdoings, its case against the Wassners is a loser.

What is most striking, and telling, in the government's recitation of its case is just how long it takes before there is any mention of the Wassners. To my mind, that ·the government is suffering frustration and inconvenience in its effort to prosecute the Wassners is an insufficient reason to grant the rulings requested. In *Kotteakos,* the Court rejected the same argument:

> True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in [every defendant] being afforded our historic individual protections including those surrounding criminal trials.

328 U.S. at 773, 66 S.Ct. at 1252.

The government has labored mightily to find some recognized exception to the rules which would permit the introduction of its evidence. It suggests, for instance, that the evidence is "relevant." But relevant or not, the evidence must be kept out because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed.R.Evid. 403. The jury in this case will be called upon to determine whether the Wassners are guilty of conspiring with Gurary and the Sternbergs, not whether Gurary and the Sternbergs conspired with others. Guilt by association is just what Fed.R.Evid. 403 was intended to exclude.

██ The government next seeks to have this court permit the introduction of statements by Gurary and the Sternbergs which do not mention the Wassners, but which explain the activities of Gurary and the Sternbergs in connection with *other* conspiracies. Even though such statements are statements of co-conspirators, they were not made in furtherance of the conspiracy alleged in *this* indictment. The government argues that such statements are admissible, under Fed.R.Evid. 804(b)(3), as statements against penal interest. Whatever the merits of that argument, and I am not passing upon them now, they are outweighed by the mandates of Fed. R.Evid. 403. Consequently, I will not allow these statements in evidence.

**406**

The last evidentiary question is whether one witness will be permitted to testify even though he will assert his Fifth Amendment privilege. The government says the claim of privilege will only be as to collateral matters. The Wassners assert that it will foreclose them, and the jury, from ascertaining the motives underlying the witness' testimony. I agree with the Wassners. The government cannot have it both ways. It can either immunize the witness and thus free us all from guessing what such testimony will reveal, or it can choose not to immunize the witness and do without the direct testimony.

The government further requests additional handwriting exemplars from the Wassners. This case has been dragging along for almost six years. The government has all of the Wassners' corporate files, and these contain a multitude of exemplars. The Wassners have given extensive exemplars in both script and print. Each has provided twenty-four pages of handwriting exemplars. *The government has not supplied any report of a handwriting analysis.* If there was such a report, I would be more inclined to grant the government's request, even though we are now at the eve of trial. Under these circumstances, however, I see no benefit to be gained by granting this request and it is also denied.

Finally, the government requests a *Curcio* hearing to make sure that the record reflects that the Wassners know about a possible conflict of interest. Such a hearing will be had immediately before the start of this trial now scheduled for March 9, 1992 at 10:00 a.m. in Courtroom 705.

SO ORDERED.