Jerome J. JONES & Tonya
Turner, Appellants,

v.

UNITED STATES, Appellee.

Nos. 03–CF–1440, 03–CF–1493.

District of Columbia Court of Appeals.

Submitted Feb. 8, 2006.
Decided March 2, 2006.

Thomas T. Heslep, Washington, DC, for appellant Jones.

Patrick T. Hand, Washington, DC, for appellant Turner.

Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., Trena D. Carrington, and Edith M. Shine, Assistant United States Attorneys, for appellee.

Before SCHWELB, FARRELL, and KRAMER, Associate Judges.

FARRELL, Associate Judge:

A jury acquitted appellant Jones of malicious disfigurement but found him guilty of aggravated assault.[1] It convicted appellant Turner of felony threats and assault with a dangerous weapon. On appeal, Jones challenges the trial judge's refusal, in the final instructions, to state expressly that self-defense is a defense to a charge of aggravated assault, something the judge had done in relation to malicious disfigurement. Turner contests the sufficiency of the evidence on the threats charge, and contends that her indictment should have been dismissed because two government witnesses had allegedly perjured themselves before the grand jury. We reject

---

1. It also acquitted him of a separate charge of assault.

both of Turner's arguments, but hold that the judge erred when he refused Jones's request to link his defense of self-defense explicitly to aggravated assault. And because we conclude that this left open a reasonable probability that the jury believed self-defense was applicable to malicious disfigurement—as to which the link had been made—but not aggravated assault, we must reverse Jones's conviction.

## I.

The charges against both defendants arose from an altercation of July 25, 2002, that began when Turner ordered Lateasa Hill, who was living temporarily at an apartment owned by Turner, to get out of bed and leave the apartment. Angry because Hill had been "bad-mouthing" her, Turner threatened to set fire to the bed and actually sought to ignite the bedsheets with a lighter. She then swung a baseball bat at Hill and later, wielding two butcher knifes, threatened her again by exclaiming, "Don't make me have to use this." In the meantime Turner had summoned appellant Jones, the father of her two youngest children, to the scene. Jones promised to get Hill out of the apartment and, in an ensuing fight with her, successively grabbed her by the neck and arms, struck and pushed her, bit her on the forehead causing her to bleed profusely, bit her a second time, and kicked her repeatedly about the body. Hill suffered lasting injuries, requiring stitches and a recommendation of plastic surgery. Turner, for her part, continued her assaults and threats even as an ambulance arrived, declaring that "I'm ready to do more damage."

Jones took the stand and claimed self-defense, asserting that Hill had initiated the fray by striking him and menacing him with a knife. When he tried to disarm her, she clamped (or "locked") her teeth on

his chest and stabbed him four or five times. He bit her on the forehead (causing her disfigurement) in an effort to stop her from biting him. The struggle continued as she slashed at him with another knife, until he was able to tackle her to the ground and end the fight. Photographs admitted into evidence showed cut wounds on Jones's back, shoulders, and right arm, and a bite wound on his chest.

## II.

▮ We first reject summarily Turner's challenge to the sufficiency of the evidence that she threatened Hill. The evidence summarized above permitted the jury fairly to conclude that, at the least, Turner had threatened to burn Hill by setting her bed on fire if she did not leave the apartment. *See generally Griffin v. United States*, 861 A.2d 610, 615–16 (D.C.2004); *United States v. Baish*, 460 A.2d 38, 42 (D.C.1983).

▮ We reject as well Turner's claim that the indictment should have been dismissed because it was based on perjured grand jury testimony by Hill and Isis Burnette, who also witnessed the altercation. Dismissal on that ground, as an exercise of the court's supervisory authority, is a narrow exception to the rule that "[a]n indictment returned by a legally constituted and unbiased grand jury that is valid on its face is enough to call for a trial on the merits." *Hunter v. United States*, 590 A.2d 1048, 1051 (D.C.1991). Where "false material testimony [was] presented to the grand jury," dismissal is warranted "only where it is established that the false testimony substantially influenced the grand jury's decision to indict or where there exists a 'grave doubt' whether [that] decision ... was free from the substantial influence of the false testimony." *Id.* at 1051–52.

Here, the trial judge was alert to the possibility that some grand jury testimony by Hill and Burnette might have been false, but ultimately he "[did] not ... agree with ... the defense attorneys as to the record showing that the witnesses falsely testified at the grand jury." Contrary to Turner's contention now that the judge should have reviewed the grand jury testimony before reaching that conclusion, he was not asked to do so by defense counsel. Moreover, as the government points out (Br. for Appellee at 38 & n. 44), the judge knew from the proceedings that the indictment had been returned based on testimony by at least two other witnesses who also testified at trial. *See Sanders v. United States*, 550 A.2d 343, 345 (D.C. 1988) (false testimony supporting indictment not material because other incriminating evidence presented to grand jury also supported probable cause to indict). Most importantly, the circumstances of the two witnesses' inconsistent stories in the grand jury and at trial—as well as the details of the "letter immunity" each had received—were fully arrayed before the petit jury, under instructions directing it, *inter alia*, to scrutinize with care "the testimony of an admitted ... perjurer" and to consider such inconsistencies in evaluating credibility. Turner has presented no reason why in these circumstances the extreme remedy of dismissal was nevertheless required as a matter of law.

### III.

■ We turn, then, to Jones's claim of instructional error, based upon the assertion that the judge's rejection of his request to have self-defense made expressly applicable to aggravated assault, as it had been to malicious disfigurement, may have

resulted in a negative inference by the jury that the defense was not available for the former offense. The government responds essentially that the general self-defense instruction given by the judge suggested no limitation on its applicability, and that the arguments of both counsel—Jones's attorney and the prosecutor—similarly implied no distinction as to self-defense between the two crimes.

### A.

The proceedings relevant to the issue are easily summarized. After issuing general instructions, the judge turned to defining the crimes charged in the order stated in the indictment. As relevant here, he first defined the elements of aggravated assault, D.C.Code § 22–404.01 (2001), without mention of self-defense as something the government was obliged to disprove. He next[2] defined the elements of malicious disfigurement, *id.* § 22–406, by quoting substantially verbatim the standard Criminal Jury Instructions for the District of Columbia, No. 4.15 (4th ed. rev. 2005) (Redbook), as follows:

The essential elements of the offense of malicious disfigurement, each of which the government must prove beyond a reasonable doubt, are:

1. That the defendant inflicted an injury on the complainant;

2. That the defendant acted voluntarily and on purpose, not by mistake or accident;

3. That, at the time the defendant inflicted the injury, s/he specifically intended to disfigure the complainant; and

---

**2.** We omit the intervening definition of assault with a dangerous weapon applicable to

Turner.

4. That, as a result of the injury, the complainant was permanently disfigured; and

5. That the defendant did not act in self-defense; and

6. That there were no mitigating circumstances.

The judge explained that "[s]elf-defense is a complete defense to malicious disfigurement," and that he would define self-defense later. After defining the remaining charge (assault as to defendant Turner) and aiding and abetting, he then took up self-defense proper, stating first that "Jones' theory of the case is that he acted in self-defense." He followed with the lengthy standard instruction on self-defense. *See* Redbook, Nos. 5.12 *et seq.*

After the full instructions had been given, Jones's counsel asked the judge to advise the jury specifically that self-defense was a defense to aggravated assault, because (a) the judge had done so in the case of malicious disfigurement and (b) in reading the general self-defense instruction he had not stated specifically to which offenses it applied. The judge rejected the request, stating:

> While the instruction on malicious disfigurement did specifically say that [self-defense] is a complete defense to [that offense], it doesn't say it specifically in the aggravated assault instruction, and there must be a reason for that.

### B.

In *Swanson v. United States*, 602 A.2d 1102 (D.C.1992), this court addressed a claim that the trial judge had erred by instructing the jury on self-defense after defining all of the charged offenses, rather than—as the defendants apparently had sought—instructing on the theory immediately after the definition of second-degree murder. In rejecting the contention that this might have induced a belief by the jury that the defense was inapplicable to the murder charge, the court explained that "[t]he trial judge [had] expressly informed the jury that the claim of self-defense would apply to '[s]econd degree murder while armed [and other enumerated offenses].'" *Id.* at 1107. Citing the presumption that juries will follow trial court instructions, the court found no error "where the judge [had] specifically identified the offenses to which self-defense is relevant." *Id.*

The government asserts that *Swanson* "does not stand for the proposition that a trial judge must expressly state the charges to which self-defense applies" (Br. for Appellee at 23). That may indeed correctly describe—or limit—the holding of *Swanson*, but our decision there nevertheless perceived the danger of jury confusion where multiple charges have been submitted to a jury along with a self-defense instruction not specifically linked to any of them. Moreover, the present case has an aspect not present in *Swanson*. Here the judge, quoting the Redbook instruction for malicious disfigurement, did tie self-defense expressly to one, but only one, of the two serious charges against Jones, explaining further that he would define that "element" of the offense later. In such circumstances, there is no good reason for a trial court not to identify each of the charges to which self-defense applies, especially when asked to do so, as here. And the risk that, absent such an express link, the jury in these circumstances will apply a rough layperson equivalent of *inclusio unius est exclusio alterius* in considering the relevance of the defense is appreciable. We conclude that, on the facts of this case, the judge erred in not acceding to Jones's request.

Jones adds that the danger that the jury thought self-defense applied only to mali-

cious disfigurement is especially realistic here because the trial judge himself showed uncertainty on the point, speculating that "there must be a reason" why the Redbook instruction for aggravated assault does not incorporate self-defense expressly. The government responds that this reading of the judge's words unfairly imputes to him ignorance of the rudimentary principle that self-defense, where raised, applies to any assault offense—that, much more likely, the judge was asking the sound question of why the Redbook drafters had singled out malicious disfigurement for incorporation of self-defense (more precisely, the absence thereof) as an "element." [3] Ultimately we cannot say what the judge meant, but either supposition—Jones's or the government's—underscores the danger already identified: that without further specification, the jury may have been misled by the Redbook instruction to consider self-defense only where told that it could and nowhere else.

The government asserts that the closing arguments of counsel dispelled any misimpression the jurors had because in advocating for, and opposing, self-defense neither Jones's counsel nor the prosecutor distinguished aggravated assault from malicious disfigurement in regard to self-defense. First, however, the final language the jury heard were the instructions by the trial judge, not the arguments of counsel (and the jury had the written instructions with it in the jury room). Furthermore, the judge gave the following pointed instruction concerning the difference between arguments of counsel and the court's instructions about the law:

> While the lawyers may have commented during their closing arguments on some of these rules, it was proper for them to do so. The statements and the argu-

ments of the lawyers, however, are not evidence, and they are only intended to assist you in understanding the evidence. Nevertheless, you are to be guided only by what I say about them[,] if there is any difference between what the lawyers have told you and what I tell you.

Finally, although asking why a jury has acquitted is a hazardous inquiry, Jones's acquittal on the one charge linked directly to self-defense by an instruction raises, by itself, at least some question about the jury's proper application of the defense to the companion charge.

Altogether, then, we lack the necessary "fair assurance" that the erroneous failure to specify the applicability of self-defense did not influence the jury's verdict. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

*Affirmed as to Turner; reversed as to Jones.*

---

**3.** No such incorporation takes place, for example, in the case of the standard instruction for second-degree murder, also requiring proof of "malice."